542 A.2d 409

**Kenneth Wilbur HARRIS, Sr.**

v.

**Winslow WOMACK, et al.**

**No. 1617, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

June 14, 1988.

Robert E. Farnell, III, Cambridge, for appellant.

David A. Vorhis (Webb, Burnett, Jackson, Cornbrooks & Wilbur, on the brief), Salisbury, for appellees.

Argued before WILNER, GARRITY and ROSALYN B. BELL, JJ.

WILNER, Judge.

On April 15, 1983, a tractor-trailer collided with an automobile at the intersection of Easton Parkway and Bay Street, in Talbot County. The tractor-trailer was owned by Kenneth Harris (Kenneth) and was being driven by his son Keith Harris (Keith);[1] the automobile was owned by Win-

---

1. At the time of the accident, Keith's name was Keith D. Johnson. Although he had lived with Mr. and Mrs. Harris for quite some time, he was not then related to them. Later, Mr. Harris adopted Keith. For convenience, we shall use their first names whenever possible.

slow Womack and was being driven by his son Charles Womack.

In July, 1984, Kenneth sued Winslow and Charles Womack in the Circuit Court for Talbot County, seeking recovery for the damage caused to his tractor-trailer and for the loss of income from it. He contended that Charles Womack had negligently made a left turn in front of the tractor-trailer and thus charged him with failure to grant the right-of-way and failure to exercise due care. Winslow Womack was never served with process and so never became a party to the action. Kenneth's case proceeded against Charles alone.

In October, 1984, Charles answered Kenneth's complaint and in November filed a third-party claim against Keith. He alleged in that pleading that the accident was caused solely by Keith's negligence—essentially, speeding, failure to keep a proper lookout, failure to yield the right-of-way to vehicles lawfully in the intersection, and failure to keep his vehicle under control. A copy of the third-party complaint was mailed to Kenneth; the sheriff's return shows that a copy was served on Keith on December 11, 1984.

Keith never answered the third-party complaint, and, on November 20, 1986, on Womack's motion, the court entered an order of default against Keith. See Md. Rule 2–613(a). Notice of that order was apparently mailed to Keith and to counsel for Kenneth as required by Rule 2–613(b).[2] When no response was made to the order of default, Womack moved for a default judgment. A copy of that motion also was mailed to counsel for Kenneth (who also later acted as counsel for Keith) although not to Keith himself, and, once again, no response was forthcoming. On January 20, 1987, the court entered the following order:

---

**2.** The record itself does not indicate that either the motion or the order was mailed to Keith, but Keith acknowledged in response to a question from the court that "a copy of that order of default was mailed ... to the two attorneys and to [him] on ... or about November 20th," although he claimed that he never received it.

"Upon legal and satisfactory proof that personal jurisdiction was obtained over the Third Party Defendant, Keith D. Johnson, that Notice of Entry of an Order of Default was promptly mailed to the Third Party Defendant pursuant to Rule 2–613(b), it is . . .

ORDERED by this Court that the Judgment by default as to liability to the Third Party Plaintiff is entered against Keith D. Johnson, Third Party Defendant, for any and all sums which may be awarded against Defendant Charles Winslow Womack in favor of the Plaintiff, Kenneth Wilbur Harriss [sic], Sr."

In March, 1987, Womack moved for summary judgment in the original action filed by Kenneth. The basis for the motion was the default judgment entered against Keith, which, according to Womack, established Keith's negligence (or, at least, contributory negligence). That negligence, Womack argued, was imputed to Kenneth, for whom Keith was acting as agent, and thus Kenneth's action was fatally flawed by contributory negligence.

Suddenly, upon the filing of that motion, Kenneth and Keith woke up to the consequence of the default judgment. On March 24, 1987, Kenneth and Keith jointly moved to set aside the enrolled judgment, asserting that Keith "was never served with process herein and only received papers from his father." Kenneth also answered the motion for summary judgment.

At a hearing held on both motions on May 7, 1987, Keith testified that he had never been served with the third-party complaint by the sheriff, that he was not in Caroline County on December 11, 1984, when the sheriff reportedly served the papers on him,[3] and that he had received the papers from his *mother* (not his father, as he alleged in his motion) "two months, no more than two months, a month, two months; could have been a little way either way" earlier. He produced testimony and some documents from the

---

3. Keith and Kenneth lived in Caroline County, which is where Keith would have been served, if he were served.

Wheatley Trucking Company, for whom he hauled freight in December, 1984, indicating that (1) on December 10, he made a delivery in East Providence, Rhode Island, (2) either on the 11th or the 12th, he made a pick-up in Seabrook, New Jersey, and delivered that load to Cambridge, Maryland, and (3) he was scheduled to drive from Cambridge to Pittsburgh on the 12th. According to Keith, he not only did not receive any papers from the sheriff, but he never received any of the motions or the order of default.

It was stipulated that the sheriff had no independent recollection of whether he had served the papers on Keith and would be unable to identify Keith.

The court found that copies of the motions and order were, in fact, mailed to Keith. It also observed that he could have been at home in Caroline County for a short period, and thus available for service, on the evening of December 11. But the court never made a specific finding as to whether Keith had or had not been served by the sheriff. As "admittedly a conjecture or a suspicion on my part," the court mused that the sheriff left the papers at Keith's home "because somebody at that residence told him that Keith would be back shortly and they would give them to [him]."

Everyone "implicitly agrees," said the court, "that the papers were in fact left there. What they disagree about is whether there was hand-to-hand service of process." In that regard, the court noted, "[t]he evidence certainly raises a question about whether or not there was, in fact, personal service in the sense that Deputy Magrogan laid the suit papers in [Keith's] hands...." Instead of resolving that evidentiary dispute, however, the court relied on other, equitable considerations in denying the motion to upset the judgment.

Accepting "as the beginning proposition" that Kenneth received the papers from the sheriff and then gave them to his wife, the court concluded that Kenneth had a motive not to give the papers to Keith which "makes me very suspi-

cious about the testimony and about the chain of facts and circumstances as they're outlined." Although that suggests a finding that Keith's story was less than credible, the court went on to hold that:

"In short, I will deny the motion to set aside the judgment, for the equitable reasons that I've indicated. If the law says that in the absence of clear and convincing evidence that the sheriff's service was in fact hand-to-hand made, my decision is wrong, and if the Court of Special Appeals wants to tell me that, fine. Then the case would revert to a status of no judgment."

Following that announcement, the court granted Womack's motion for summary judgment and eventually entered judgment for Womack. This appeal, *by Kenneth alone,* ensued, the single argument being that the court "abused its discretion in failing to set aside a default judgment for lack of jurisdiction because Writ of Summons was never served on Keith...."

It is, of course, axiomatic that a court cannot render a valid *in personam* judgment against a person unless it first acquires jurisdiction over that person, and that jurisdiction is initially acquired by service of process. Whether a person has been served with process is essentially a question of fact, one that occasionally, as here, is in dispute. Because sheriffs and their deputies (1) serve so many papers day in and day out and cannot be expected to retain independent recollections of each service and (2) generally have no personal interest in the litigation, the law has accorded their written returns a presumptive correctness. As stated in *Ashe v. Spears,* 263 Md. 622, 627–28, 284 A.2d 207 (1971), *cert. denied* 406 U.S. 958, 92 S.Ct. 2061, 32 L.Ed.2d 344 (1972):

"The rule of our cases is that the return of service of process is presumed to be true and accurate and a mere denial by a defendant, unsupported by corroborative evidence or circumstances, is not enough to impeach the return of the official process server.... This is because

the affirmative testimony of the official process server acting in the regular routine of duty without a motive to misrepresent must be preferred to the negative evidence of one claiming not to have been served, either for reasons of public policy or as a matter of probability...."

(Citations omitted.)

It is true, of course, that the presumption of service founded upon the sheriff's return may be overcome, but that is not something easily done. As pointed out in *Weinreich, Adm'x v. Walker*, 236 Md. 290, 297, 203 A.2d 854 (1964),

"there may be successful impeachment of service seemingly valid on the record but, in all the Maryland cases in which there has been, the circumstances have ranged from virtual demonstration of the lack of service ... to clear and convincing evidence that there had not been service, in the form of corroboration of the defendant's claim that there had not been, *by independent disinterested witnesses,* plus lack of refutation, when challenged, by the sheriff or others."

(Emphasis added.)

There was not that kind of evidence here. Kenneth was hardly an "independent disinterested witness"; nor did the testimony of Ms. Blades, the Wheatley Trucking Co. employee, or the records supplied by her necessarily exclude the possibility that Keith was in fact served as the sheriff's return attested. To the extent that the court implicitly found that the sheriff did not, in fact, serve Keith, we would have grave difficulty with such a finding on this record. But we need not rest our judgment on that alone.

In *Fisher, Admrx. v. DeMarr*, 226 Md. 509, 515, 174 A.2d 345 (1961), the Court held that "a judgment or decree of a court without jurisdiction is void and may be attacked directly by a party or a privy, *if he is not estopped to do so,* and collaterally by a stranger whose interests or status would be adversely affected if it were valid...." (Emphasis added.) The *Fisher* Court did not explain the circum-

stances under which a person might be estopped from challenging a "void" judgment, but subsequent cases have given us some examples.

In *Pryor v. Pryor*, 240 Md. 224, 213 A.2d 545 (1965), the Court held that a party could be estopped by laches from attacking a judgment rendered in the absence of jurisdiction. The judgment at issue there was a divorce decree entered in 1946. Thirteen years later, after the husband had remarried and later died, the wife challenged the decree on the ground that she had never been served with process and that neither she nor the husband had ever been residents of Maryland. The Court rejected that challenge, observing, at 229, 213 A.2d 545, that "[t]he weight of authority in the United States sustains the application of the defense of laches in suits involving attempts to set aside a divorce decree obtained by a spouse who lacked the necessary residence requirements which would give the divorce court jurisdiction as conferred by statute." It noted indeed cases "where the defense of laches was applied even though the court lacked jurisdiction over the subject matter, but had in personam jurisdiction over both parties." *Id.*, 229, 213 A.2d 545.

Although the *Pryor* Court pointed out the special harm that can accrue in the context of divorce decrees, it did not appear to limit its holding that laches could bar a belated attack on an otherwise "void" judgment to that circumstance. It noted, instead, the "strong public policy *generally* in sustaining the finality of judgments and decrees." (Emphasis added.) *Id.*

Further explication of this principle of estoppel came in *Travelers v. Nationwide*, 244 Md. 401, 224 A.2d 285 (1966). The action began with a landlord's suit for repossession of the leased premises. Although no request for unpaid rent was made, the court entered a judgment against the tenant for $5,300 in back rent. The tenant appealed and posted a bond, written by Travelers, for the $5,300. The tenant thereafter dismissed the appeal and surrendered the premis-

es, whereupon the landlord sought to recover the $5,300 from Travelers.

The Court of Appeals began by making clear that the entry of the money judgment was unconstitutional, "invalid and therefore subject to collateral attack." *Id.*, 411, 224 A.2d 285. But, by appealing the judgment (and later dismissing the appeal), the tenant adversely affected the landlord's right to recover the premises and was accordingly estopped from attacking the judgment; Travelers, which stood in the shoes of the tenant, was likewise estopped.

Estoppel, said the Court, is a question of fact. "Wrongful or unconscientious conduct on which the other party relies, to his detriment, is generally an element of estoppel in the particular circumstances ... but an estoppel may arise even when there is no intent to mislead, if the acts of one party cause a prejudicial change in the conduct of the other." (Citations omitted.) *Id.*, 414, 224 A.2d 285. Having effected a stay of the judgment and precluded repossession of the property through the posting of the bond, "[n]ow that [the tenants] have dismissed their appeal, it would be contrary to equity and good conscience to allow Travelers, which stands in their shoes, to assert as a defense to the bond that the money judgment was invalid." *Id.*, 416, 224 A.2d 285. Finally, the Court held, at 417, 224 A.2d 285:

"We have held that even though a judgment collaterally attacked was void for lack of jurisdiction over the parties, the party attacking it may be barred from asserting the invalidity because of laches. *Pryor v. Pryor*, 240 Md. 224, 229, 213 A.2d 545 (1965) and authorities therein cited. It is true that in *Pryor* we referred to the public policy involved in not lightly setting aside decrees of divorce, but there also is a public policy involved in the present case....

Courts in other jurisdictions have held that, when the facts warrant, a party may be estopped by conduct from collaterally attacking a void judgment."

The trial court here apparently rested its decision on a finding that Kenneth deliberately withheld delivering the papers intended for Keith for nearly two years, and that such conduct was inequitable. If, indeed, Keith was not served directly by the sheriff, the evidence supported the finding that Kenneth did, in fact, hold on to the papers—not just the summons and third-party complaint but also the copies of the various motions and the order of default that had been mailed to Keith. There can be little doubt that such conduct was not only inequitable but reprehensible. And it clearly affected Womack's rights; with the passage of so much time, he lost the ability of the sheriff to recall the details of the service made by him. Under these circumstances, we have no hesitation in concluding that Kenneth is estopped from challenging the default judgment entered against Keith.

JUDGMENT AFFIRMED;

APPELLANT TO PAY THE COSTS.